**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | **No. 25-cr-367** |
| **v.** | ) | |
| | ) | **Judge Rebecca Pallmeyer** |
| **MELVIN DOYLE** | ) | |

**DEFENDANT'S SENTENCING MEMORANDUM**
**AND OBJECTIONS TO THE PSR**

Mr. Doyle stands before this Court after pleading guilty to possession of a firearm by a convicted felon. He is deeply disappointed that, after 20 years of focusing on being a hard worker, devoted father, and contributor to his community, he experienced a significant lapse in judgment that led him to this courtroom. His arrest in this case and its aftermath have reminded Mr. Doyle how important it is to maintain his focus on the important, positive things in his life. He knows that any future misstep will put everything he's worked to rebuild at risk. He accepts responsibility for his actions and is prepared to serve a just sentence. In this case, the parties agree that the appropriate sentencing range is 0-6 months. The defense submits that the Section 3553(a) factors suggest that the statutory purposes of sentencing will be satisfied by a sentence of time served, with a two-year period of supervised release to follow.

## THE GUIDELINES AND OBJECTIONS TO THE PSR

*I. Factual Objections to PSR*

**Paragraph 76:** The PSR notes that "police reports indicate the defendant is, or historically was, affiliated with the Black P. Stones street gang." Mr. Doyle objects to any suggestions that he is currently affiliated with the Black P. Stones gang and asks that the language be stricken from the PSR. Speculation as to gang affiliation can be very

detrimental in the BOP, where the assessment of a public safety factor of "disruptive group" can mean that an individual is designated to a higher-security facility.[1] The defense notes that the Chicago Police Department's system of tracking gang affiliation, commonly referred to as the "gang database," is notoriously unreliable.[2]

**Paragraph 104**: The PSR states that Mr. Doyle did not provide verification of his employment. However, following the PSI, Pretrial Services confirmed to counsel that Mr. Doyle is employed.

*II. Legal Objections to PSR*

Part A of the PSR relies on the allegations of the original complaint in this case to characterize certain alleged conduct as Relevant Conduct. None of that alleged conduct is part of the factual basis of the plea agreement, the Government's Version, or the information provided to the Probation Office by the case agent. Nor does the government take the position that any other alleged offenses in the complaint are proven relevant conduct in the Plea Agreement or the Government's Version. As noted in the Government's Supplemental Version of the Offence, there is good reason the government does not rely on the allegations in the complaint. Mr. Doyle therefore objects to the characterization of any extraneous and unproven conduct in any paragraph of the PSR. Specifically, he objects to the inclusion of Paragraphs 8 and 9, as well as the second and third sentences of Paragraphs 11 and 14 of the PSR.

---

[1] *See* Nancy Glass, *The Social Workers of Sentencing? Probation Officers, Discretion, and the Accuracy of Presentence Reports Under the Federal Sentencing Guidelines*, 46 No. 1 Crim. Law Bulletin ART 2 (2010) ("PSFs are assigned for certain activities in the prisoner's record, such as designation as a sex offender, or belonging to a "disruptive group," i.e., a gang. PSFs have a great effect on placement—a single PSF rules out prison camp as a confinement option, and the "disruptive group" PSF means automatic placement in a high security facility.").

[2] *See* City of Chicago Office of Inspector General, *Review of the Chicago Police Department's "Gang Database,"* (April 11, 2019), https://igchicago.org/wp-content/uploads/2023/08/OIG-CPD-Gang-Database-Review.pdf (acknowledging that "CPD's gang information contains incomplete and contradictory data").

Mr. Doyle also objects to the imposition of the four-level enhancement set forth at Paragraph 16. He has made no admission, and the government has presented no evidence sufficient to meet the evidentiary threshold, regarding any additional firearms. As a result, this enhancement is inappropriate, and Mr. Doyle asks that the entirety of ¶16 be stricken.

*The Appropriate Guideline Range*

The defense maintains that the appropriately calculated guideline range is that which was set forth in the plea agreement: 10-16 months. Mr. Doyle further maintains that the appropriate range for the Court to consider is the parties' agreed 0-6 months.

## SECTION 3553(A) FACTORS

### I. Mr. Doyle's History and Personal Characteristics Shed Light on His Past and its Tug on Him in this Case, 18 U.S.C. S 3553(a)(1)

When Mr. Doyle is asked about his life, he generally focuses on his blessings. He doesn't speak (without prompting) about the obstacles that he has overcome. But he has faced significant adversity in his life, starting at birth, and that adversity has shaped him.

Mr. Doyle was born on the South side of Chicago to Rosemary Doyle. PSR ¶57. He was the fourth of Ms. Doyle's five children, and none of his half-siblings shared his father. PSR ¶58. Throughout his childhood, Mr. Doyle's mother and grandmother told him that a local man named Charles Edward Bey was his father. PSR ¶57. It wasn't until he was an adult that he acknowledged suspicions of doubt and took an ancestry test to confirm that Mr. Bey was not his father. *Id*. To this day, Mr. Doyle does not know for sure who his father is, although his exploits with his DNA have given him some clues to pursue. Regardless, Mr. Doyle had no contact throughout his childhood with his biological father, and no loving father figure consistently present in his life.

His mother Rosemary was a lifelong heroin addict and struggled to control her addiction. PSR ¶59. In hindsight, because he never saw her sober for any sustained period of time, Mr. Doyle strongly suspects that she probably used when she was pregnant with him and all of her other children. Rosemary could never keep a job and was mostly supported by her boyfriends, who were often drug dealers. As a child, Mr. Doyle had no idea that his mother was using drugs, or what her addiction meant; he and his siblings just thought it was funny that she could never stay awake. Because of her incapacitation, by the time Mr. Doyle was five or six years old, the children were split up and sent to live with various family members. PSR ¶59. Mr. Doyle and his other brother Joseph were sent to live with his maternal grandmother, Jessie Mae Doyle, for a period of some years. *Id*. His older sisters were moved out of state, and Mr. Doyle never reconnected with them until adulthood. *Id*.

According to Mr. Doyle, Jessie Mae tried her very best to provide for him and Joseph. PSR ¶60. Her best efforts, however, couldn't outrun the reality of life on the south side. Jessie Mae only worked sporadically, counting on funds from her ex-husband and boyfriends to sustain the family. *Id*. She and the boys moved around the Woodlawn and South Shore neighborhoods frequently, due to "financial issues," per Mr. Doyle. *Id*. Often, Jessie Mae couldn't afford to pay for groceries or utilities, and the lights or the gas would be turned off. The family frequently turned to church food pantries to get their meals. *Id*. There were winter nights when Mr. Doyle remembers eating rice and cheese sandwiches, huddling around the hot plate for warmth because the gas was off. When asked in the PSI about birthdays and holidays, and whether there was money for gifts or celebrations, Mr. Doyle just shook his head sadly, saying only "I remember those days, and they were not so good."

But, Mr. Doyle hastens to say, Jessie Mae made sure that the boys had food in their bellies before they went to bed.

As hard as she tried, Jessie Mae couldn't protect the boys from the realities of poverty inside the home, and she couldn't protect them from the violence. There was a brief period of time when Rosemary came to collect Mr. Doyle and Joseph from Jessie Mae when Mr. Doyle was about 9 years old. Rosemary and her current boyfriend were selling drugs out of an abandoned building with multiple units. Mr. Doyle and his brother lived in one unit, and Rosemary would communicate with them through the intercom. The boys were often left to fend for themselves and to find their own food. During that time period, Mr. Doyle remembers horrific abuse at the hands of his mother's evolving cast of boyfriends. There were times they would whip him and his brother with extension cords in the bathtub, while their bodies were still wet. PSR ¶63. There were times when the boyfriend would lay the boys on a bed and begin whipping them with cords, threatening that if the boys moved, they would have to "start over" with the whipping. As a "lesser" punishment when the boys misbehaved, they were made to stand in the corner of the room for hours at a time, or crawl under the bed and lie still. PSR ¶63. Eventually, after about a year, Jessie Mae found out where the boys were living and sent a cousin to bring them home to her. Mr. Doyle and his brother remained with Jessie Mae until their later teenage years.

Although they eventually escaped the violence at home, the violence in the neighborhood remained. PSR ¶59. Mr. Doyle recalls frequent drive-by shootings, including one incident where a bullet ricocheted up to a third-floor apartment, killing a child in his bed. Mr. Doyle describes seeing the mother carrying the child's lifeless body down the stairs, sobbing. Friends and neighbors died in gang clashes. When asked to estimate how

many friends and neighbors he lost to gun violence, Mr. Doyle thought the tally was over 50. Twice, Mr. Doyle saw individuals die firsthand. When he was about 12, a mentally ill woman who frequently roamed the neighborhood muttering and screaming jumped out of a third story window. Mr. Doyle was part of the crowd that had gathered to yell at her not to jump and thus was on hand to see her hit the ground. For months, Mr. Doyle had nightmares that it was he who was falling out of the window. About two years later, Mr. Doyle witnessed a couple on a motorcycle speeding down King Drive and getting sideswiped by a car. Mr. Doyle still remembers the sounds their bodies made when they flew off their bike into a fire hydrant. In sum, it was a wretched childhood, full of want and violence that no child should endure.

Eventually, Mr. Doyle himself got swept up in the violence. The man he believed to be his father, Charles Edward Bey, was a prominent member of the Black P Stone Nation. PSR ¶57. Indeed, Mr. Bey is often described as Jeff Fort's right-hand man and was rumored to be involved in a number of murders.[3] Mr. Bey was respected and feared in the South Shore neighborhood, and when Mr. Doyle came to visit in his early teens, Mr. Bey would introduce him around as one of his 22 children. Similarly, in Mr. Doyle's memory, all of his mother's boyfriends were either drug dealers or "stick-up artists." Mr. Doyle's uncle, Michael Doyle, was also significantly involved in the Chicago drug scene. PSR ¶65. Most of the neighborhood men that Mr. Doyle looked up to were involved in the streets. This world was essentially so normalized that Mr. Doyle never even contemplated charting a different path. Under the influence of his family members and his older peers in the community, Mr. Doyle dropped out of school at age 16 and fell in with the streets.

---

[3] *See* Carol Marin & Don Moseley, *Hundreds Mourn Death of Former Gang Member*, NBC 5 Chicago (Oct 20, 2011) https://www.nbcchicago.com/news/local/charles-edward-bey-gang-funeral/1914053/

When Mr. Doyle was 17, he was arrested by CPD on an attempted murder charge and spent over a year in pretrial custody before he was found not guilty at a bench trial. PSR ¶45. Mr. Doyle's freedom was short-lived, however, as he was arrested on two more cases, one murder and one attempted murder, a week later. PSR ¶30; 48. After three and a half years in pretrial custody on those cases, Mr. Doyle was found not guilty on the murder at a bench trial in July 1998. PSR ¶48. Shortly after the verdict, however, Mr. Doyle's retained attorney explained that the retainer had been exhausted, and Mr. Doyle's family had no more money to continue paying for the final trial. Mr. Doyle agreed to a plea in the attempted murder case that carried a ten-year sentence and would allow him to go home after about one year in IDOC custody. PSR ¶30.

[redacted]

[redacted]

[redacted]

While he was incarcerated in Cook County, Mr. Doyle elected to participate in the drug treatment program through HRDI. Although he had smoked marijuana regularly, through the course of sharing his experiences with other addicts, Mr. Doyle began to recognize that his true addiction was to "the hustle." The lifestyle was so deeply embedded in him that at any point of stress, he would lapse back into it and feel at home. Mr. Doyle says that at that point, his eyes were opened and resolved to do better.

Upon his release in 2007, Mr. Doyle committed to leaving his wayward lifestyle behind. He knew that he could not return to the same neighborhood that he grew up in without falling into old habits, so moved in with a cousin in Bronzeville. He cut off his relationships with people in the old neighborhood and turned to his faith for stability. Mr. Doyle worked any job he could find: for Avon, for moving companies, in construction. He learned that he

had a talent in carpentry, so he began picking up whatever jobs he could in that field. But what mattered most to Mr. Doyle was that when he was without work, he refused to return to the hustle. He told himself he could never go back and held on to his belief in himself that he would persevere no matter the circumstance.

In 2009, Mr. Doyle began dating Cathy Gunn and his son, Melvin Junior, was born. His son was born with serious health complications that put extraordinary pressure on the relationship, which soon fractured. But the couple was determined to co-parent their child successfully, and every weekend and every summer, Mr. Doyle had custody of his son.

[redacted]

Mr. Doyle felt stable in his new life, but he always acknowledged that his background was still part of who he was. Instead of allowing his past to be a negative attribute, however, Mr. Doyle found a way to make it a positive thing. Because of the time he had served in custody, young men in the neighborhood looked up to Mr. Doyle as having lived experience. He had befriended men in the Cook County Jail and IDOC who returned to a street lifestyle and had rank in the gangs, which gave Mr. Doyle credibility in these young men's lives. From 2016 to 2019, he worked for Claretian Associates and CURE Violence as a violence interrupter. Any time there was a shooting in South Shore, he and his colleagues would canvass the neighborhood to gather information about what had happened and whose tempers were running high. They would try to gather participants who were willing to engage and diffuse tempers through conversation. Mr. Doyle also carried a caseload of

young "participants" who he mentored. In addition to serving as a sounding board, Mr. Doyle would bring them along on jobs, when possible, both to keep them off the streets and to concretely demonstrate to them there were ways to make good money lawfully.

Around 2019, he noticed that his work in the streets engaging in de-escalation was starting to become particularly overwhelming for him. The work was high risk and tense, and Mr. Doyle began to feel the pressure acutely. He asked his supervisor for a referral for a mental health evaluation and was eventually diagnosed with PTSD. While Mr. Doyle declined the offers of medication and therapy, he found the diagnosis was helpful to him in terms of naming his feelings and reactions. Ultimately, Mr. Doyle felt that his work with youth at these organizations was the most successful form of therapy for him, as he derived significant satisfaction from the thought that his interventions could save other young people in his community from experiencing the things he had.

For nearly twenty years, Mr. Doyle has avoided trouble with the law. He has, in his own words, kept his head down and focused on creating a life for himself and his family. He takes pride in the way he turned his life around based on sheer will. He is proud of his independence and self-sufficiency, and the way he managed to abstain from hustling in tough times.

Unfortunately, Mr. Doyle never completely severed every relationship with individuals in his old neighborhood. While those relationships never led to trouble before, in 2023, an old friend introduced him to the confidential informant in this case. Mr. Doyle had recently fallen on hard times, both financially and in his personal life. Through the confidential informant, Mr. Doyle allowed himself to be led back down a path he swore he would never walk.

**II. Circumstances of the Offense, 18 U.S.C. S 3553(a)(1)**

Mr. Doyle knows that his actions in this case were wrong, and that he never should have been anywhere near a gun. He attributes his behavior to complacency and the desire to earn a little extra income. In his words, he lost his focus. He now recognizes that no amount of money is worth his freedom or being taken away from his son, and that he must be constantly vigilant and committed to resisting the influences of his old life.

**III. Deterrence and Recidivism, 18 U.S.C. S 3553(a)(2)(C).**

Mr. Doyle acknowledges that part of the Court's sentencing calculus focuses on the risk of recidivism each individual defendant presents. He submits that there is good reason for the Court to trust that he will not make the mistake of returning to the behavior that has landed him in hot water.

First, Mr. Doyle has taken responsibility for his actions and is truly remorseful. As soon as he was arrested, he spoke with officers about his role in this case. In owning up to his actions and working with the government, Mr. Doyle has demonstrated his regard for the law and a commitment to lawful behavior going forward.

Second, Mr. Doyle has already experienced significant consequences as a result of this case and the sting of those losses offers him strong motivation to keep out of trouble in the future. When Mr. Doyle was arrested, federal agents called his employer, purportedly to verify employment. Mr. Doyle lost his job, as well as his employer-provided residence. For a period of months on bond, Mr. Doyle was forced to sleep in his car. As a result of this housing instability, Mr. Doyle's son, whom he has had primary custody of since the age of 14, had to move out of Mr. Doyle's residence and back in with his mother. Although Mr. Doyle still saw his son daily when he picked him up from school, he keenly felt the loss of

connection that comes with cohabitating with his son and being there for the small, everyday moments. He took pride in providing for his son and was devastated when that collapsed. His son graduates from high school next spring, and Mr. Doyle wants to be present to cheer him on and support him as he transitions to adulthood. The two share a close bond, and Mr. Doyle is extremely motivated to do everything he can to stay physically present in his son's life. To that end, Mr. Doyle has worked hard to find a new residence where his son can join him, and the two were reunited in a new apartment last month.

Third, after the upheaval that this charge resulted in, Mr. Doyle has been committed to seeking out stability. After his arrest and termination, Mr. Doyle sought whatever opportunities he could to use his handyman and carpentry skills and earn income. Once his electronic monitoring condition was removed in January, Mr. Doyle was able to secure more consistent work as a security guard. He currently works the evening shift six days a week. This job has been the foundation of his return to stability. As noted above, through the support of friends, Mr. Doyle was able to find a new residence. That home is in Calumet City, far from the influences and individuals that caused him to lose focus. And mentally, Mr. Doyle is strong. Having been through the trials of the past year, he is even firmer in his conviction that he could hit rock bottom and will not break or fold: no matter how financially distressed he is, he's not going back to hustling.

Finally, statistics support the notion that Mr. Doyle has a low risk of reoffending based on his personal characteristics. Research by the Sentencing Commission has found that individuals who were 50 or older at the time of sentencing have much lower rates of recidivism than those who are younger.[4] Additionally, individuals in Criminal History

---

[4] *See* U.S. Sent'g Comm, O*lder Offenders in the Federal System*, p 43 (July 2022) https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2022/20220726_Older-Offenders.pdf

Category I who have zero points (but prior contact with the justice system) have markedly lower recidivism rates than even those with even a single criminal history point.[5]

## IV. A Sentence of Time Served Would Not Result in Unwarranted Disparities, 18 U.S.C. S 3553(a)(1).

The PSR suggests that similarly situated defendants received an average sentence of 14 months. ¶135. However, when one considers the information in ¶133 of the PSR and the appropriately calculated guideline range of 10-16 months, the Sentencing Commission dataset shows that the average sentence for similarly situated defendants is 2 months. Nearly 60% of similarly situated defendants received probationary sentences, and additional defendants received sentences of time served.[6] *See* Exhibit A. When the Sentencing Commission dataset is further filtered to the Seventh Circuit, the data shows all six defendants from FY2021-2025 with Mr. Doyle's characteristics received probationary or time served sentences. *See* Exhibit B.[7]

## CONDITIONS OF SUPERVISED RELEASE

Mr. Doyle suggests that a period of two years of supervised release is sufficient in this case. The defense notes that the Sentencing Commission recently amended §5D1.2 partly in response to concerns that courts reflexively impose supervised release terms without individualized consideration. *See* U.S. Sent'g Comm, *Amendments to the Sentencing Guidelines* at 32 (April 30, 2025), https://www.ussc.gov/sites/default/files/pdf/amendment-

---

[5] *See* U.S. Sent'g Comm, *Recidivism of Federal Offenders Released in 2010*, p 27-28 (Sept 2021) https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2021/20210930_Recidivism.pdf

[6] Sentences of "one day time served" are counted as sentences of imprisonment by the USSC and thus not included in the "probation" statistic.

[7] The Sentencing Resource Counsel's website allows you to view the USSC dataset on a district basis. The one case in the Northern District of Illinois had an average imprisonment of 0.03, which is equivalent to one day, indicating a sentence of one day time served. The same is true for the one case in the Southern District of Illinois, and the remaining four cases from the Northern District of Indiana.

process/reader-friendly-amendments/202505_RF.pdf. Application Note 1 to §5D1.2 now emphasizes that: "The court should ensure that the term imposed on the defendant is sufficient, but not greater than necessary, to address the [rehabilitative] purposes of imposing supervised release on the defendant." Mr. Doyle has been on pretrial release for over a year, including six months with electronic monitoring, and has had zero violations. PSR ¶5. His reintegration to the community has not been without hardship, but there are no signs that he requires extended supervision in order to be successful.

Mr. Doyle objects to the following proposed conditions of supervised release:

- **Discretionary Condition #1, financial support**: Prior to gaining full custody of his son years ago, Mr. Doyle was ordered to make child support payments. He has now had full custody of his son for over five years but has never moved to vacate or amend that order. He is considering doing so, and counsel does not want a state court to interpret any condition of supervised release as dictating the propriety of any amendment.

- **Discretionary Condition #6, association:** Mr. Doyle suggest that the word "felony" be inserted before the phrase "criminal activity" in the first sentence. Without that amendment, Mr. Doyle could be deemed in violation for very minor incidents, like being a passenger in a car parked illegally.
  Mr. Doyle also objects to the restriction on meeting known gang members. The reality is that, due to his upbringing, many of his family members and friends had previous associations with neighborhood gangs and it is uncommon for an individual to formally disassociate from a gang, even if they are no longer active in those activities. Mr. Doyle suggests that the language be amended to "active known gang members."

- **Discretionary Condition #19, home confinement/detention:** Mr. Doyle objects to the recommendation of home confinement. When imposing discretionary conditions, a district court must consider the factors set forth in 18 U.S.C. §3583(c)–(d), which cross-reference 18 U.S.C. §3553(a). The conditions "cannot involve a greater deprivation of liberty than is reasonably necessary to achieve the goal of deterrence, incapacitation, and rehabilitation." *United States v. Kappes,* 782 F.3d 828, 845 (7th Cir. 2015); 18 U.S.C. § 3583(d)(2). Noticeably absent from the list of factors for the court to consider is 18 U.S.C. §3553(a)(2)(A): "the need for the sentence imposed—…to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." The goal of supervised release is rehabilitation and reintegration into the community, not further punishment. However, the proposed imposition of home confinement is explicitly geared to

punishment. *See* Recommendation, at 7. This condition is not "reasonably necessary" to advance the goals of supervised release, particularly where Mr. Doyle has been successfully rehabilitating in the community for the past year, including stepping steadily down on levels of electronic monitoring. He has had no violations in the past year, and confinement is not necessary to aid his rehabilitation.

- **Special Condition #12**, **buy money**: Mr. Doyle maintains his objection, above, to the consideration of unproven and undermined allegations from the complaint in the PSR. Consistent with that, Mr. Doyle objects to the assertion that he should pay buy money to the ATF. The defense also notes that such a requirement was not included in the plea agreement.

## CONCLUSION

Mr. Doyle understands the factors that led to him getting involved in this case. He regrets his actions and has already taken considerable steps to distance himself from the thinking and influences that led him astray. He asks the Court to consider the Supreme Court's logic in *Gall*, where the Court reasoned that respect for the law is promoted when harsh punishment is tempered by consideration of an offender's character and personal history, in addition to the specific characteristics of the case at hand. *See* 552 U.S. at 54.

**Wherefore**, based on the sentencing factors and arguments set forth above, Melvin Doyle respectfully requests that this Court impose a sentence of time served, to be followed by a period of supervised release of two years.

Respectfully submitted,

FEDERAL DEFENDER PROGRAM
John F. Murphy,
Executive Director

By: *s/ Amanda G. Penabad*
Amanda G. Penabad
*Attorney for Melvin Doyle*

Federal Defender Program
55 East Monroe Street, Suite 2800
Chicago, Illinois 60603
(312) 621-8300

# EXHIBIT A


SRC sentencing resource counsel
HOME NEWS ABOUT RESOURCES FAQ
Total Cases
68
Filters
Fiscal Year
2021
2025
Circuit
(All)
District
(All)
Offense type
Firearms
Primary Guideline
2K2.1
Criminal History Category
1
Final Offense Level
12
Primary drug type
(All)
924C: at least one count?
(All)
1028A: at least one count?
(All)
5K1.1
yes
Career Offender applied
no
Mitigating role levels
(All)
Map Metric
1.000
8.000
Choose map metric
Number of cases
Race
White
Black
Hispanic
Other
30.9%
32.4%
32.4%
Disposition
100.0%
Plea
Sex
Male
Female
55.9%
44.1%
Citizenship
U.S. citizen
Not US cit...
94.1%
Education
Less than HS grad
HS grad
Some college
College grad
22.1%
36.8%
39.7%
Sentence Type
Probation only
Probation & alternati...
Prison & alternatives
Prison only
51.5%
8.8%
38.2%
Placement w/r/t Guidelines
100.0%
5K1.1
Sentence and Imprisonment Lengths
Months
2.1
0.0
3.9
0.0
Mean Sentence Length
Median Sentence Leng...
Mean Imprisonment Length
Median Imprisonment Le...

# EXHIBIT B


Sign in to Westlaw |...
SRC sentencing resource counsel
HOME
NEWS
ABOUT
RESOURCES
FAQ
Total Cases
6
Filters
Fiscal Year
2021
2025
Circuit
7th
District
(All)
Offense type
Firearms
Primary Guideline
2K2.1
Criminal History Category
1
Final Offense Level
12
Primary drug type
(All)
924C: at least one count?
(All)
1028A: at least one count?
no
5K1.1
yes
Career Offender applied
no
Mitigating role levels
0
Map Metric
1.000
4.000
Choose map metric
Number of cases
Race
16.7%
33.3%
50.0%
White
Black
Hispanic
Disposition
100.0%
Plea
Sex
33.3%
66.7%
Male
Female
Citizenship
100.0%
U.S. citizen
Education
16.7%
50.0%
33.3%
Less than HS grad
HS grad
Some college
Sentence Type
50.0%
50.0%
Probation only
Prison only
Placement w/r/t Guidelines
100.0%
5K1.1
Sentence and Imprisonment Lengths
Months
0.03
0.02
0.01
0.00
0.0
0.0
0.0
0.0
Mean Sentence Length
Median Sententence Leng...
Mean Imprisonment Length
Median Imprisonment Le...